IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JALEH ASLANI, | : | |
| | : | |
| Plaintiff, | : | Civil Action File No. |
| V. | : | No. _____ |
| | : | |
| EQUIFAX INFORMATION SERVICES, LLC; CORELOGIC CREDCO, LLC, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**Preliminary Statement**

1.  Defendants EQUIFAX, LLC and CORELOGIC CREDCO, INC. are both national consumer reporting agencies which have been selling or reselling credit reports inaccurately marking Plaintiff as deceased.  When credit reporting agencies inaccurately report a living consumer as deceased, Defendants makes it practically impossible for that consumer to access credit, as it did with Mrs. ASLANI.  Defendants' practices also harm the businesses that purchase its reports; as such companies cannot process credit applications due to the applicant's lack of a credit score.  There is no good faith rationale to explain Defendants' practices other than the generation of revenue.  If Defendants believed that Mrs. ASLANI was

deceased, then they had no legally permissible basis to sell her report. If Defendants believed Mrs. ASLANI was alive, they knowingly sold her report with a gross inaccuracy. Moreover, Defendants knew that identity thieves use the credit information of truly deceased persons to commit credit fraud. Defendants thus violated Plaintiff's rights under the Fair Credit Reporting Act ("FCRA") as set forth below.

## Jurisdiction and Venue

2. Jurisdiction of this court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

3. Venue lies properly in this district pursuant to 28 U.S.C. § 1391 (b).

## Parties

4. Plaintiff Jaleh Aslani ("ASLANI") is an adult individual residing in Decatur, Georgia and is subject to the jurisdiction of this Court.

5. Defendant Equifax Information Services, LLC is a consumer reporting agency that regularly conducts business in the Northern District of Georgia.

6. Defendant Equifax Information Services, LLC (hereafter "EQUIFAX") is a Georgia Limited Liability Company which has a principal place of business located 1550 Peachtree Street, N.W., Atlanta, GA 30309.

7. EQUIFAX may be served by personal service upon its registered agent in the State of Georgia, to wit: Kent Mast, 1550 Peachtree Street, N.W., Atlanta, GA 30309.

8. Alternatively, EQUIFAX may be served by personal or substitute service pursuant to the Federal Rules of Civil Procedure and, as applicable, the laws of the State of Georgia.

9. Defendant, Corelogic Credco, LLC (hereafter "CORELOGIC") is a consumer reporting agency and reseller of credit information which regularly conducts business in Georgia and which has a principal place of business located at 12395 First American Way, Poway, CA 92064.

10. CORELOGIC may be served by personal service upon its registered agent in the State of Florida, to wit: Corporation Service Company, 1201 Hayes Street, Tallahassee, FL 32301-2525.

**Factual Allegations**

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

11. Defendant EQUIFAX is regulated as a "consumer reporting agency" ("CRA") under the FCRA. 15 U.S.C. § 1681a(e).

12. Defendant CORELOGIC is regulated as a "consumer reporting agency" ("CRA") under the FCRA. 15 U.S.C. § 1681a(e).

13. Defendant EQUIFAX sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

14. Defendant CORELOGIC sells or resells consumer reports (often called "credit reports" or "reports" or "tri-merge reports") and credit scores to various markets, including but not limited to the automobile financing industry.

15. Pursuant to the FCRA, Defendants must follow procedures which assure that the reports it sells meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

16. Pursuant to the FCRA, Defendant must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.

17. Defendants should place a "deceased" notation or marking on reports when it is advised from any of its many data furnishing sources that a given consumer is deceased.

18. The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

19. Defendants do not request or require a death certificate from any of its

data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

20. Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

21. Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

22. A deceased notation is a very unusual marking upon a credit file or credit report.

23. In some cases, in order to assure accuracy, Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their EQUIFAX or CORELOGIC credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. But neither Defendant has a similar procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is

furnished to Defendants to be placed in said consumer's credit file or report.

24. Defendants regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. But Defendants do not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

25. Defendant will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

26. Neither of the Defendants employ any procedures *at all* which assures that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

27. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants employ no procedures which assure that a consumer with a "deceased" mark on his/her report

is, in fact, deceased before placing the "deceased" mark on that consumer's report.

28. Even in instances where the purportedly deceased consumer communicates directly with Defendants, Defendants employ no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

29. Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

30. Nevertheless, Defendants routinely sell to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

31. Upon Defendants' reports with a "deceased" mark sold to third parties Defendant never calculates or provides a credit score for that consumer.

32. Defendants know that third party credit issuers use a credit score in order to process a given credit application.

33. Defendants know that many third party credit issuers require a credit score in order to process a given credit application.

34. Defendants know that consumers without credit scores are unable to

secure any credit from most credit issuers.

35. Defendants know that living consumers are turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

36. Defendants have been generally put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

37. Defendants have received and documented many disputes from consumers complaining that their EQUIFAX and CORELOGIC credit report had them erroneously marked as "deceased."

38. Defendants know that thousands of consumers are erroneously marked as "deceased" on their EQUIFAX and CORELOGIC credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

39. Nevertheless, both Defendants employ no procedures which assure that a consumer marked as "deceased" on one of Defendant's reports is, in fact, deceased..

40. Even consumers who dispute the erroneous "deceased" status on their EQUIFAX and CORELOGIC credit reports continue to be erroneously

marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

41. Defendants have no independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

42. Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

43. For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

44. Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them– meaning that nobody is continuing to buy that report from EQUIFAX or CORELOGIC.

45. Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

46. Defendants profit from the sale of reports on the deceased.

47. Defendants have in their respective credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

48. Defendants know that truly deceased consumers do not apply for credit.

49. Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to EQUIFAX and CORELOGIC to be a common and major source of identity theft

50. Defendants knew that identity theft and credit fraud are serious and widespread problems in our society.

51. Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

52. Defendants have no similar death certificate, executorship paper, or any other proof requirements for its data sources which report a consumer as deceased or for the buyers of its reports which access the purportedly deceased consumer's information.

53. Defendants sell reports on the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

54. For consumers who are deceased, there rarely if ever exists a permissible purpose under the FCRA for Defendants to ever sell their credit reports, absent a court order.

55. Defendants knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

56. For a period of Time since November 2012 Plaintiff had been marked by Defendants as deceased on her credit reports with the defendants.

57. Plaintiff is not deceased.

58. Defendants did not calculate or provide any credit score for or on Plaintiff, even though it sold reports about her to third parties marking her as "deceased."

59. On January 11, 2013, the plaintiff attempted to purchase a Toyota Camry from World Toyota.

60. World Toyota purchased a tri-merge credit report from CORELOGIC

which erroneously noted that Plaintiff was deceased.

61. The CORELOGIC report shows that the erroneous "deceased" notation was provided to them by EQUIFAX.

62. Plaintiff provided actual notice to EQUIFAX on one or more occasions in January that she was alive and that they were improperly reporting her as deceased and to delete the deceased notation on her credit reports.

63. Defendant EQUIFAX failed to heed Plaintiff's actual notice of the erroneous "deceased" notation and continued to report her as deceased.

64. Plaintiff was denied a Macy's credit card on or about March 2, 2013 as a result of the "deceased" notation.

65. As a result of the "deceased" annotation, Defendant made it practically impossible for Plaintiff to obtain credit.

66. Plaintiff also suffered harm to credit reputation and emotional distress as a result of Defendant's conduct.

67. At all times pertinent hereto, Defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

68. At all times pertinent hereto, the conduct of the Defendants, as well as that of its agents, servants and/or employees, was intentional, willful,

reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## Count One – Violations of the FCRA

69. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

70. At all times pertinent hereto, Defendant was a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

71. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

72. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

73. Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, EQUIFAX is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. § 1681e(b).

74. The conduct of Defendant was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to the Plaintiff that are outlined more fully above and, as a result, Defendant is liable to the Plaintiff for the full amount of

statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

### Jury Trial Demand

75. Plaintiff demands trial by jury on all issues so triable.

### Prayer for Relief

WHEREFORE, PLAINTIFF RESPECTFULLY PRAYS THAT JUDGMENT BE ENTERED AGAINST DEFENDANT AND IN FAVOR OF PLAINTIFF, AS FOLLOWS:

a)   That Plaintiff be awarded statutory, actual, general, and punitive damages;

b)   That Plaintiff be awarded the expenses of litigation including a reasonable attorney fee;

c)   That the Court grant such further and additional relief as is just and proper in the circumstances.

Respectfully submitted,

SKAAR & FEAGLE, LLP

by:   /s/ James M. Feagle
James M. Feagle
Georgia Bar No. 256916

jfeagle@skaarandfeagle.com
108 East Ponce de Leon Avenue
Suite 204
Decatur, GA 30030
404 / 373-1970
404 / 601-1855 fax

Justin T. Holcombe
Georgia Bar No. 552100
jholcombe@skaarandfeagle.com
Kris Skaar
Georgia Bar No. 649610
krisskaar@aol.com
P.O. Box 1478
331 Washington Ave.
Marietta, GA 30061-1478
770 / 427-5600
404 / 601-1855 fax